**HICKMAN v. TAYLOR et al.**

Civ. A. No. 3511.

District Court, E. D. Pennsylvania.

Oct. 9, 1947.

See, also, 329 U.S. 495, 67 S.Ct. 385.

Freedman, Landy & Lorry, of Philadelphia, Pa., for plaintiff.

Clark, Brown, McGown, Fortenbaugh & Young, of Philadelphia, Pa., for Taylor & Anderson.

Guckes, Shrader & Burtt, of Philadelphia, Pa., for B. & O. R. Co.

KIRKPATRICK, District Judge.

The plaintiff was appointed, under the law of Pennsylvania, administrator of Norman E. Hickman, a seaman who was drowned when the tug J. M. Taylor on which he was employed capsized on the Delaware River. This action to recover damages for the death is against two defendants, Taylor and Anderson, the employers of the seaman, and the Baltimore and Ohio Railroad, which is alleged to have participated in the employer's negligent conduct. The cause of action against Taylor and Anderson is based upon the Jones Act, 46 U.S.C.A. § 688, and that against the Baltimore and Ohio Railroad Company upon the maritime law of torts. By stipulation the case was tried to the Court without a jury.

On February 5, 1943, a carfloat belonging to the Baltimore and Ohio sank in the Delaware River at Pier 12 North, in Philadelphia, with a load of freight cars on board. Having arranged for the removal of the cars from the float, Mr. J. H. Murray, the Baltimore and Ohio Marine Superintendent, on the following day, Saturday, February 6, engaged Taylor and Anderson to tow the carfloat to a shipyard some distance up the river on the New Jersey side, for repairs, in response to which instruction the tugs, J. M. Taylor and Philadelphia, were sent. The freight cars were removed but the carfloat, apparently stuck in the mud at the bottom, had to be pulled out by the tugs. She came to the surface and remained afloat with decks awash and the tugs began to tow her up the river. They had proceeded only a short distance when the float sank. The tugs attempted to pull her along the bottom, and succeeded in getting her to the New Jersey bank of the channel where it was found to be impossible to move her any farther. The Taylor then returned to the pier for instructions. Upon her report Mr. J. H. Murray telephoned to Captain Anderson, one of the defendant partners, and told him that Captain Alton Murray of the Taylor had suggested that the best thing to do was for the tug to stand by or "lay by" the sunken float until they could get a derrick to pull her out or at least get her farther up the bank, which would probably not be before Monday morning. With Mr. J. H. Murray's approval, Captain Anderson directed Captain Alton Murray to go out and stand by the sunken float until such time as a buoy could be placed to mark the spot where she lay.

By this time it was dark and the Taylor returned to the Philadelphia, took over the towline from her and remained moored to the float in that fashion during the night.

After the Taylor left the pier Captain Anderson called the Army Engineers' office in order to arrange for placing a buoy but, receiving no answer, concluded that, it being Saturday evening, the office was closed and made no further effort to get in touch with the Engineers.

The Taylor lay moored to the float all night with steam up, not anchoring, but swinging with the tide and current.

The following morning about 5:45 there was a thud and a grinding sound on the

bottom of the tug and she rolled a little and took a slight list to the starboard. Five minutes later the vessel took a second roll with a more pronounced list. The mate ran to the engine room, told the assistant engineer on duty that something was wrong and ordered him to be prepared to move. A bell was rung from the bridge and the engines were started then stopped at a second bell signal and then started again at a third. About ten minutes after the first roll the chief engineer sent his assistant to call the men sleeping in the forecastle. While the latter was going forward the tug suddenly seemed to be lifted out of the water, rolled all the way over on her starboard side and sank. The carfloat was seen momentarily above the surface, after which she immediately disappeared and sank to the bottom.

From the first shock until the tug turned over ten to fifteen minutes elapsed during all of which time the tug was listing and never completely righted herself.

Hickman was drowned in the forecastle. His body when found was clothed only in underwear, indicating that he was probably asleep in his bunk when the tug went down.

In addition to the foregoing, I make the following specific findings.

1. The tug sank in navigable water within the territorial limits of the State of New Jersey.

█ There is practically no dispute that the barge stuck fast when she came to the New Jersey side of the channel. "International law today divides the river boundaries between states by the middle of the main channel, when there is one, and not by the geographical center, halfway between the banks." New Jersey v. Delaware, 291 U.S. 361, 379, 54 S.Ct. 407, 413, 78 L.Ed. 847.

### The Case Against Taylor and Anderson

2. No general alarm was sounded on the tug nor were the men in the forecastle aroused from their sleep at any time.

Comment: Even if the testimony of the mate, taken at the Coast Guard hearing, were admissible (which it is not) it would not establish that he did any more than "call" the men after the tug took the first roll. There was nothing to show that he made sure that they were actually aroused or warned of danger. On the contrary, Savage who was asleep in the forecastle testified that he was not awakened until the capsizing of the tug threw him out of his bunk—and he was the first man out of the forecastle. Hickman never got out at all. The chief engineer heard no one call the men at any time.

3. Failure to sound a general alarm and failure to arouse the men in the forecastle during the ten to fifteen minute period from the first rising of the carfloat to the sinking of the tug was negligence on the part of the master and officers of the tug.

Comment: There was ample opportunity for those in charge of the tug to have actually aroused and warned the men and also to have sounded a general alarm so that all would be on deck to meet any emergency.

4. The rising of the carfloat to the surface from her submerged position on the channel bank was the cause of the disaster and it should have been anticipated as likely to occur by experienced seamen familiar with the characteristics of such vessels and with towing operations.

Comment: The carfloat was constructed entirely of wood and carried no equipment except the rails, which obviously could not have affected her buoyancy to any appreciable degree. There was testimony (if testimony on the point was needed) that such a wooden hull would, when freed from obstruction or suction on the bottom, rise to the surface, and it is clear that those who were directly concerned with the operation had in mind that she might do so. It is quite true that from the time the tow began until she was finally recaptured and returned to the pier, several weeks later, the carfloat behaved in an extraordinary fashion. However, the mysterious thing was why she sank half a dozen times in spite of having enough buoyancy to rise—on one occasion six or eight feet above the surface. It was not her repeated submerging that created the dangerous situation which re-sulted in this particular accident, but her normal and foreseeable coming up after the first sinking.

5. It was negligence for the tug to lie throughout the night moored only by the

towline to the sunken carfloat, and this negligence is attributable to both the master of the tug and Captain Anderson who, understanding that she would carry out his order in that manner, directed the master of the tug to stand by. This negligence was a substantial factor in causing the sinking.

Comment: Both Captain Anderson and Captain Alton B. Murray knew that the tug had been once stuck in the mud at Pier 12, because she had to be pulled to the surface by two tugs. Captain Murray's report of the sinking of the float was that in the course of the tow the tug had taken a dive and stuck in the mud on the New Jersey side of the channel and that he thought she had hit the bank; and this diagnosis of the situation was undoubtedly correct. Both were unquestionably aware that the changing of the tides and currents especially with the additional pull of the tugboat on the hawser would have a tendency to dislodge the carfloat and to break whatever suction might be holding her down. They must also have known that as the current changed the tugboat, swinging on the line, would be quite likely to pass directly over the spot where the float lay on the bottom. It was, of course, not only desirable but necessary that the sunken float should be marked in some way in order to warn navigation on the river. There were, however, feasible alternatives to the method adopted. Assuming that it was not possible to get in touch with the Army Engineers so that a proper buoy could be placed, an improvised buoy consisting of a spar, an oil drum or even a small boat with a light, could have been used. These makeshifts had their drawbacks no doubt, but with any of them the tug could have remained somewhere nearby, but out of danger, during the night to give additional warning. Naturally, the tug would want to keep hold of the hawser, but it does not appear from any evidence in the case that, if she was to do so and herself act as a buoy, she could not have dropped anchor at a safe distance away from the float. The hawser could have been extended or replaced in part by a lighter line if that should prove necessary. The tug had lights and a whistle and could have warned river traffic without having to lie directly over the sunken float.

The whole of Captain Anderson's testimony indicates rather definitely that he expected Captain Murray to let the tug swing on the hawser. He knew that the wreck would not be buoyed, and if he had understood that Captain Murray would anchor or intended that he should he would almost certainly have said so.

### The Case Against the Baltimore and Ohio

The plaintiff's case against the Baltimore and Ohio depends entirely upon whether Mr. J. H. Murray knowingly participated in the plan which caused the disaster.

The Restatement of the Law of Torts, Sec. 876, page 435, gives the applicable rule, which I adopt as a conclusion of law, as follows: "For harm resulting to a third person from the tortious conduct of another, a person is liable if he (a) orders or induces such conduct, knowing of the conditions under which the act is done or intending the consequences which ensue, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself. * * * Advice or encouragement to act operates as a moral support to a tortfeasor and if the act encouraged is known to be tortious, it has the same effect upon the liability of the adviser as participation or physical assistance."

There is no question that, with regard both to the towing operation which terminated when the float sank, and the steps taken to mark the place of the sinking during the night, Taylor and Anderson were independent contractors and the Baltimore and Ohio neither retained nor exercised any control as to the manner of doing the work over the tug, its captain or crew. This fact alone, however, does not completely insulate the Railroad from all responsibility for what happened. It merely eliminates liability on the basis of respondeat superior. No one can, by contract, escape being held liable for a tort in which he participates.

6. Mr. J. H. Murray passed on to Captain Anderson Captain Murray's suggestion that a tug stand by at the place of the sinking, agreed with Captain Anderson's

conclusion that that would be the best thing to do and made his company responsible for the tug's charges for doing it.

7. Other than the foregoing, Mr. J. H. Murray gave no instructions or advice and made no suggestions as to the method to be employed in making use of the tug to warn river traffic of the sunken float. Nor did he know or have reason to know that it would be done by allowing the tug to swing free on the hawser attached to the float.

■ Comment: This fact finding goes to the heart of the case against the Baltimore and Ohio and relieves that defendant of liability. The burden was upon the plaintiff, and I find nothing which convinces me that Mr. Murray knew or had any reason to know the manner in which the job would be done. Mr. Murray was the Baltimore and Ohio's "superintendent of floating equipment". He was a marine engineer, had worked in the drafting room and in the shops and had designed and superintended the construction of carfloats. His job had mainly to do with repairs and the like and did not include directing the operations of the Railroad's two tugboats, although he had authority to contract for towing services when additional tugs were needed. Captain Anderson did not testify that he advised Mr. Murray that the tug would lie moored only to the sunken float, although he testified that "the only way she could have stood by is by holding on to the line." The only support for a finding that Mr. J. H. Murray understood that that was what would be done would be an inference that he must have anticipated it, based on his position and experience, and I do not draw that inference, but on the contrary have found that he did not so understand. To hold a third person as a contributing tortfeasor participating in an act which causes injury it must appear that he has or should have knowledge that the act in which he participates, not in itself negligent, will be done in a way that is tortious, dangerous, negligent or likely to cause harm. Murray, a landsman, did no more than assent to a plan, not in itself obviously dangerous and agreed to as proper by two experienced seamen.

## Conclusions of Law

■ I. The defendants, Taylor and Anderson, are liable to the plaintiff for damages for the death of Norman Hickman.

■ II. The Baltimore and Ohio is not liable to the plaintiff.

■ III. The maritime law of torts governs the question whether the conduct which caused the death of Hickman constitutes negligence for which either or both of the defendants is liable.

The death took place on a ship lying in navigable waters and the acts and conditions which caused it lay wholly and exclusively in the field of maritime operations. Upon this primary issue the place of the disaster with relation to the Pennsylvania-New Jersey boundary line is immaterial. The determining factor is that it took place upon navigable waters.

■ IV. The extent of Taylor and Anderson's liability is governed by the maritime law of the United States supplemented by the Jones Act.

■ V. The extent of the Baltimore and Ohio's liability is governed by the general law of maritime tort of the United States supplemented by the New Jersey death statutes.

Discussion: The findings of fact dispose of the case against the Baltimore and Ohio Railroad so far as this Court is concerned. However, inasmuch as there may be a review by an appellate court, it seems proper to deal with the matter of the law governing the extent of its liability as well as that of Taylor and Anderson.

The plaintiff contends that the Pennsylvania death statute is applicable, relying upon Thompson Towing & Wrecking Ass'n v. M'Gregor, 6 Cir., 207 F. 209, and Patton-Tully Transp. Co. v. Turner, 6 Cir., 269 F. 334. If the rule of these cases were applicable to the present case, the Pennsylvania statute would govern, with the result that should the Baltimore and Ohio be held liable the damages would include the economic value of the life—an element not recognized by either the New Jersey statutes or the Jones Act.

It is generally accepted law that in all matters relating to the "internal management or discipline" of a ship the law of the flag controls. Where states, not nations, are involved the law of the domicile of the vessel is equivalent to the law of the flag, but the limitation of the rule is clear and definite and recognized in every case in which the rule has been discussed. If the subject matter of the action arises out of an act within the field of navigation then the rule does not apply because that is a field involving the "peace, dignity and tranquility" of the state in whose waters the accident occurred. The "safe place" theory urged by the libellant, even assuming it to be applicable to the Baltimore and Ohio, a third party, must be understood within the limitation of the rule just stated and means a "safe place" so far as the structure, gear, machinery, etc., of the ship are concerned. Otherwise it would nullify the accepted rule in every collision case. While the accident in the present case was not a violation of any rule of navigation of the State of New Jersey, it was caused by the external management of the vessel in territorial waters and, if not technically a collision in the strictest sense, was actually caused by the violent impact of one vessel upon another.

The special rule of Thompson Towing & Wrecking Ass'n v. M'Gregor, supra, not being applicable, general principles of conflict of laws control. "The law of the place of wrong governs the right of action for death." "The place of wrong is in the state where the last event necessary to make an actor liable for an alleged tort takes place." Restatement, Conflict of Laws, Sections 391 and 377. The "last event" was the submerging of the forecastle, from which the drowning of Hickman resulted. Rundell v. La Compagnie Generale Transatlantique, 7 Cir., 100 F. 655.

The New Jersey statutes give two separate and distinct causes of action for tort causing death. The death statute, N.J.S.A. 2:47-1 et seq., provides for damages for pecuniary loss resulting to the widow, husband or next of kin. It can be brought only by an administrator ad prosequendum. The present suit is brought by a general administrator but, even if an administrator ad prosequendum could now be substituted, it would not help the plaintiff very much because the measure of damages would be the same as under the Jones Act. The New Jersey survival statute allows a recovery to the estate as distinguished from the beneficiaries only for loss that accrued between the injury and the death. N.J.S.A. 2:26-9. Soden v. Trenton Tract Corporation, 101 N.J.L. 393, 127 A. 558; Prudential Ins. Co. v. Laval, 131 N.J. Eq. 23, 23 A.2d 908, 913. "It is in the interval between injury and death only that loss can accrue to the estate, and in that alone is the personal representative interested." Prudential Ins. Co. v. Laval, supra. In the present case there could be no recovery for anything other than pain and suffering. Under the New Jersey survival statute the action is properly brought by the general administrator.

VI. Recovery against Taylor and Anderson is limited to (1) loss to the father and mother of pecuniary benefits and (2) damages for pain and suffering.

As a further fact finding, I fix the damages as follows: Pecuniary loss sustained by the beneficiaries through the death, $4,-000. Compensation for pain and suffering, $1,000. Total, $5,000.

VII. The plaintiff is entitled to judgment against the defendant, Taylor and Anderson, in the amount of $5,000.

VIII. The defendant, Baltimore and Ohio, is entitled to judgment in its favor.

IX. The petition of the defendant, Taylor and Anderson, to amend their answer to plead the defense of limitation of liability is denied on the grounds of (1) laches and (2) privity.