UNITED BROTHERHOOD OF CARPEN-
TERS AND JOINERS OF AMERICA,
DISTRICT COUNCIL OF KANSAS CITY,
MISSOURI, AND VICINITY, A. F. OF
L., et al. v. SPERRY, for and on Behalf
of NATIONAL LABOR RELATIONS
BOARD.

No. 3654.

United States Court of Appeals
Tenth Circuit.

Nov. 2, 1948.

Rehearing Denied Dec. 6, 1948.

Clif Langsdale, of Kansas City, Mo. (Clyde Taylor and John J. Manning, both of Kansas City, Mo., and Chauncy B. Little, of Olathe, Kan., on the brief), for appellants.

Dominick L. Manoli, of Washington, D. C. (Robert N. Denham, General Counsel, David P. Findling, Associate General Counsel, Winthrop A. Johns and Albert Dreyer, all of Washington, D.C., on the brief), for appellees.

Before BRATTON, HUXMAN and MURRAH, Circuit Judges.

BRATTON, Circuit Judge.

Section 1 of the act approved June 23, 1947, 61 Stat. 136, 29 U.S.C.A. § 141 et seq.,

commonly called the Taft-Hartley Act, and hereinafter referred to as the act, contains a declaration of policy in which it is recited that industrial strife which interferes with the normal flow of commerce and with the full production of articles and commodities for commerce can be avoided or substantially minimized if employers, employees, and labor organizations each recognize under law one another's legitimate rights in their relations with each other; and further, that it is the purpose of the act, in order to promote the full flow of commerce, to prescribe the legitimate rights of both employers and employees in their relations affecting commerce, to provide orderly and peaceful procedures for preventing the interference by either with the legitimate rights of the other, and to protect the rights of the public in connection with labor disputes affecting commerce. In conventional language, section 2(6) defines the term "commerce" to mean trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia or any Territory of the United States and any State or other territory, or between any foreign country and any State, Territory, or the District of Columbia, or within the District of Columbia or any Territory, or between points in the same State but through any other State or any Territory or the District of Columbia or any foreign country. In equally conventional language, section 2(7) defines the term "affecting commerce" to mean in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce. Section 8(b) (4) (A) provides that it shall be an unfair labor practice for any labor organization or its agents to engage in, or to induce or encourage the employees of any employer to engage in, a strike or concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities, or to perform any services, where the object thereof is to force an employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person. Section 8(c) provides in effect that the expressing of any views, argument, or opinion, or the dissemination thereof, shall not constitute or be evidence of an unfair labor practice under any of the provisions of the act, if it contains no threat of reprisal, or force, or promise of benefit. Section 10(a) empowers the National Labor Relations Board, as thereinafter provided, to prevent any person from engaging in any unfair labor practice listed in section 8 affecting commerce. Section 10(b) provides that whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board, or any agent or agency designated by the Board for that purpose, shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect; that the person shall have the right to file an answer to the complaint; and that a hearing shall be had, conducted so far as practicable in accordance with the rules of evidence in the district courts of the United States. Section 10(c) provides that if upon the preponderance of the testimony taken, the Board shall be of the opinion that the person named in the complaint has engaged in or is engaging in any such unfair labor practice, it shall state its findings of fact and shall issue and cause to be served on such person an order requiring him to cease and desist, and to take such affirmative action including the reinstatement of employees with or without back pay as will effectuate the policies of the act. Section 10(e) authorizes the Board to petition the Circuit Court of Appeals of the circuit in which the unfair labor practice occurred, or the circuit in which the person committing such unfair labor practice resides or transacts business to enforce such order. And section 10(*l*) provides that when it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (A), (B), or (C) of section 8(b) of the act, a preliminary investigation shall be made forthwith; that if after the making of such investigation the officer or regional attorney to whom the matter may be referred has reasonable cause to believe

such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition the district court of the United States of the district where the unfair labor practice occurred, or is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to the matter; and that upon the filing of such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper. It contains a provision relating to notice, but that has no present material bearing. And it further provides that for the purpose of the subsection, district courts shall be deemed to have jurisdiction of a labor organization in the district in which such organization maintains its principal office or in any district in which its duly authorized officers or agents are engaged in promoting or protecting the interests of employee members.

Wadsworth Building Company, Inc., a corporation hereinafter referred to as Wadsworth, was engaged in the manufacture of prefabricated houses at its plant in Overland Park, Kansas. During the year immediately preceding the institution of this action, it purchased raw materials in excess of $100,000, of which approximately ninety-five per cent were shipped into Kansas; and it sold finished products in excess of $100,000, of which approximately fifty per cent were sold to customers outside of Kansas. A controversy arose between Wadsworth and United Brotherhood of Carpenters and Joiners of America, affiliated with American Federation of Labor, hereinafter referred to as Carpenters. As the result of the controversy, some or all of the union employees of Wadsworth went out on strike and pickets were placed around the plant. Klassen and Hodgson, Inc., a corporation hereinafter referred to as Klassen, was engaged in the business of constructing residences in Overland Park. Sometime prior to the strike at the plant of Wadsworth, Klassen entered into an arrangement with Wadsworth for the purchase of ten to fifteen prefabricated houses which it planned to erect on foundations in Overland Park. Sometime after the strike

at the plant of Wadsworth began, Walter A. Said, an agent of Carpenters, came to the premises where Klassen intended to erect one of the prefabricated houses and inquired whether Klassen was union or otherwise. He was advised that Klassen was just starting in business and that it intended to use union employees. A few days later Said again came to the premises. One of the prefabricated houses had been received and Klassen was engaged in its erection. One union carpenter, one nonunion carpenter, and one other non-union employee were engaged in the work. Said inquired whether it was a Wadsworth house and whether Klassen knew that the union employees of Wadsworth were on strike. The spokesman for Klassen replied that he had just recently learned of the strike, and that arrangements had been made for the purchase of the houses long prior to the beginning of the strike. He further stated that Klassen intended to employ union labor exclusively and asked whether Said could furnish union carpenters. A day or two later, Said and representatives of several other unions came to the premises, discussed with the spokesman for Klassen the matter of its purchasing prefabricated houses from Wadsworth while the strike was in progress, and urged that Klassen use its influence in forcing Wadsworth to come to terms with the unions. While there, Said suggested to the union carpenter employed on the job that he call him that night. The employee did call Said that night; Said asked the employee if he knew the conditions at the Klassen project; the employee said that he did and that it would be his last day there; and he did quit the following day. A few days later, on the recommendation of Said and representatives of other unions, the Building Trades Council of Kansas City, Missouri, and vicinity, placed Klassen on its "we do not patronize" list and circulated copies thereof to all unions composing the council, to the Teamsters Union, and to the Builders Association. The following day the Council placed a picket at the Klassen site. He carried a sign reading "Non-union building tradesmen are employed on this job. A.F.L." Thereafter union truck drivers coming to

the site with materials for delivery refused to cross the picket line and returned to their firms with the materials. As the result of the blacklist and the picketing, Klassen was handicapped and delayed in carrying forward its program of purchasing and erecting the houses. Klassen and Wadsworth filed with the National Labor Relations Board a charge that Carpenters had engaged in unfair labor practices within the meaning of section 8(b) (4) (A) of the act. The director of the Seventeenth Region of the Board investigated the charge and concluded that there was reasonable cause to believe that the charges were true and that a complaint should issue. He then filed this cause in the United States Court for Kansas seeking to enjoin Carpenters and Said as its agent from calling, engaging in, or inducing or encouraging the employees of Klassen and other employers, by orders, threats, promises of benefits, blacklists, picketing, or any other like acts or conduct, to engage in a strike, or a concerted refusal in the course of their employment to transport or handle goods or perform services in order to force or require Klassen to cease doing business with Wadsworth. By answer, the respondents denied the material allegations of fact contained in the petition and pleaded affirmatively that to restrain them as prayed in the petition would violate their constitutional rights. The court heard evidence, made findings of fact and conclusions of law, and enjoined the respondents substantially as prayed in the petition, pending the final determination of the matters by the National Labor Relations Board. The respondents appealed.

▆▆▆ It is contended that no competent or credible evidence was adduced at the trial showing that appellants, by threat of reprisal or force or promise of reward, induced or encouraged employees of other companies to refuse in the course of their employment to transport or handle materials for use in the construction of the Klassen houses, with the object and purpose of forcing Klassen to cease doing business with Wadsworth. In the trial of a nonjury case, it is the province of the trial court to observe the witnesses while testifying, to judge their qualifications, to appraise their credibility, to determine the inferences from the facts established, and to resolve conflict in the evidence. The evidence and the inferences fairly to be drawn from it were sufficient to support the material findings of fact made by the trial court, and they are not plainly erroneous. Therefore they must stand on appeal. Yates v. American Republics Corporation, 10 Cir., 163 F.2d 178; Wyoming Railway Co. v. Herrington, 10 Cir., 163 F.2d 1004; Boston Insurance Co. v. Read, 10 Cir., 166 F.2d 551.

▆▆▆ Next, it is urged with vigor that the act is limited in scope to practices affecting interstate commerce; that the dealings between Klassen and Wadsworth were essentially intrastate in character; and that the conduct of appellants did not affect interstate commerce in the manner and to the degree necessary to bring it within the range of the regulatory power of Congress. The supreme, plenary, and complete power of Congress under the Constitution to regulate interstate commerce is without restriction or limitation, except that prescribed in the Constitution; and within the reach of that paramount authority lies the power to safeguard such commerce against substantial burdens or obstructions, no matter the source from which the encroachment comes. In the exertion of its constitutional authority to protect interstate commerce, Congress may regulate not only commerce itself but matters which affect, interrupt, or stifle interstate commerce. In other words, Congress may regulate not merely transactions or goods in interstate commerce, but activities which in isolation might be deemed to be local and yet in the course of the interlacings of business across state lines affect adversely interstate commerce. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122; Polish National Alliance v. National Labor Relations Board, 322 U.S. 643, 64 S.Ct. 1196, 88 L.Ed. 1509. And acts or practices having the effect of interrupting or otherwise adversely affecting interstate commerce are not immune from Congressional regulation and control merely because they grow out of

labor disputes. National Labor Relations Board v. Jones & Laughlin Steel Corp., supra; Cf. Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430.

 The question whether or not practices of a given pattern may be deemed by Congress to affect interstate commerce in a harmful manner is not to be determined solely by the quantitative effect of the activities immediately involved. National Labor Relations Board v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014; Polish National Alliance v. National Labor Relations Board, supra. And the power to protect interstate commerce against harmful encroachment may be exercised in such manner as to have application in individual cases in which the activities are of such character that when multiplied into a general practice they could reasonably exert adverse effect calling for preventive regulation. Mandeville Island Farms, Inc., v. American Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996.

 The foregoing general principals have appropriate application here. The committee hearings, the committee reports, and the language contained in the act, considered in their totality, make it plain that Congress acted in the belief that wrongful secondary boycotts directed against industrial or commercial units engaged solely in intrastate commerce for the purpose of compelling them to cease doing business with other industrial or commercial units engaged in interstate commerce could reasonably have disruptive adverse effect upon interstate commerce, and that it was the Congressional intent and purpose to bring boycotts of that kind within the scope of the act. Here, Wadsworth purchased for use in its business large amounts of raw materials which originated in other states; and it sold large amounts of manufactured products to customers in other states. Klassen was engaged in intrastate activities. The purpose of the secondary boycott against Klassen was intended soley to compel that company to cease doing business with Wadsworth. If the practice of establishing secondary boycotts against those doing business with Wadsworth were extended sufficiently in scope it could substantially reduce the flow in interstate commerce of raw materials for use by that company in the conduct of its business, and likewise it could substantially reduce the flow in interstate commerce of manufactured products to its customers in other states. And the general practice of establishing and maintaining secondary boycotts of that kind multiplied or extended throughout the country would necessarily effect a reduction in the flow in interstate commerce of both raw materials and manufactured commodities. Therefore, while the activities of Klassen were essentially local, they were of such character and bore such relation to interstate commerce that a secondary boycott directed against it and carried forward by blacklisting and picketing for the sole purpose of compelling it to cease doing business with Wadsworth constituted an unfair labor practice, within the scope and purpose of the act. Cf. Carpenters & Joiners Union of America v. Ritter's Cafe, 315 U.S. 722, 62 S.Ct. 807, 86 L.Ed. 1143.

 The further contention is that the use of the "we do not patronize" lists and the peaceful picketing of the Klassen premises were protected by the First Amendment to the Constitution of the United States and by section 8(c) of the act. The pertinent part of the First Amendment guarantees freedom of speech and press, and section 8(c) provides that expressions of views or opinions shall not constitute an unfair labor practice under the act if they do not contain any threat of reprisal, or force, or promise of benefit. The promulgation and circulation of a blacklist and the peaceful picketing of premises in the course of a labor dispute may constitute a phase of the constitutional right of free utterance, if the blacklist is confined to the name of the employer primarily involved in the controversy and the picketing is confined to the premises of such employer. Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093; Carlson v. California, 310 U.S. 106, 60 S.Ct. 746, 84 L.Ed. 1104; American Federation of Labor v. Swing, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855; Bakery & Pastry Drivers & Helpers Local v. Wohl, 315 U.S. 769, 62 S.Ct. 816, 86 L.Ed. 1178; Thomas v. Collins, supra. But the guaranty of free

speech and free press contained in the First Amendment does not compel the United States to tolerate in all places and under all circumstances even peaceful picketing, if it has harmful effect upon interstate commerce. The constitutional right of free speech and free press postulates the authority of Congress to enact legislation reasonably adapted to the protection of interstate commerce against harmful encroachments arising out of secondary boycotts. The promulgation and circulation of a blacklist and the picketing of premises as the means of waging a secondary boycott which has the effect of substantially burdening or obstructing interstate commerce is not protected by the First Amendment or section 8(c) of the act. Concretely, neither the constitutional nor statutory provision protected appellants in their blacklisting of Klassen and their picketing of its premises as a means of waging a secondary boycott against that company, with substantially harmful effect upon interstate commerce. Cf. Carpenters & Joiners Union of America v. Ritter's Cafe, supra.

One additional feature of the case merits attention. As previously said, section 10(*l*) of the act provides that if after the making of the preliminary investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe that the charge of unfair labor practice is true and that a complaint should issue, he shall on behalf of the Board petition the district court of the United States as therein specified for appropriate injunctive relief pending the final adjudication of the Board with respect to the matter; and that upon the filing of such petition the court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper. It is not the inflexible duty of the court in every case of this kind to grant a temporary injunction to remain in force and effect until the Board makes its final adjudication of the charge of unfair labor practice. The court has a reasonable permissive range for the exercise of its discretion in the granting of injunctive relief appropriate to the particular circumstances presented, or in withholding its writ. Hecht Company v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754. At the conclusion of the trial of this case, the court inquired with respect to the status of the matter before the Board. The attorney for the Board stated to the court that the hearing before the trial examiner had ended two days previously, and that in his opinion the Board would probably make its final adjudication about two months later. With that statement freshly made, and with an expression of hope on the part of the court that the Board would render its decision in a short time, the temporary injunction was granted, pending the final adjudication of the Board. It is manifest that in making its injunction effective until the Board entered its final adjudication, the court acted in the belief that the Board would make its final adjudication with reasonable dispatch. Not only two months but approximately ten months have passed, and the Board has not acted. If the court had understood or anticipated that such a delay would intervene, it might have withheld injunctive relief, or it might have conditioned its injunction differently.

The judgment is affirmed, and the cause is remanded with authority in the trial court to determine in the exercise of its sound judicial discretion whether in view of all the then presently existing facts, conditions, and circumstances the writ should be modified or terminated in advance of the final adjudication of the Board.