## NATIONAL LABOR RELATIONS BOARD
## v. TRI-STATE CASUALTY INS. CO.

No. 4139.

United States Court of Appeals
Tenth Circuit.

March 21, 1951.

Rehearing Denied April 24, 1951.

Paul Kuelthau, Washington, D. C. (George J. Bott, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Assistant General Counsel, Arnold Ordman and Robert G. Johnson, Attorneys, National Labor Relations Board, Washington, D. C., were on the brief), for petitioner.

A. Langley Coffey, Tulsa, Okl. (of Coffey, Lassiter & Coffey), Tulsa, Okl., for respondent.

Before BRATTON, HUXMAN and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

Pursuant to the usual proceedings under Section 10 of the Labor Management Relations Act of 1947, 61 Stat. 136, 29 U.S.C.A., § 151 et seq., the National Labor Relations Board found that the respondent Tri-State Casualty Insurance Company, had engaged, and was engaging, in unfair labor practices toward the service employees of its office building in Tulsa, Oklahoma, in violation of Section 8(a)(1)(3) of the Act, and ordered the respondent to cease and desist, post statutory notice, and reinstate a discharged employee, with back pay. The respondent has failed to comply and the Board has petitioned this court under Section 10 (e) for enforcement of its order.

Respondent assails the jurisdiction of the Board, and the sufficiency of the evidence to warrant enforcement.

Respondent is an Oklahoma corporation with its principal and only office in Tulsa, Oklahoma. It writes major types of casualty insurance, such as automobile liability and workmen's compensation. It's business is solicited by 334 agents, 84 of whom are located in 14 states outside Oklahoma, on an independent contractor commission basis. The direct premiums on business written in 1947 was $993,258.65 for Oklahoma and $237,059.92 outside the state. For the same period $304,134.55 was paid out in claims on Oklahoma business and $11,059.16 on claims outside the State. In 1947 it paid out nearly $100,000 in premiums to its reinsurance agent, the General Reinsurance Company of New York City. It owns the office building in Tulsa, Oklahoma, and occupies the 7th and part of the 6th floors, serviced by the employees involved in this labor dispute.

The respondent does not deny the applicability of the Labor Management Relations Act to insurance companies as such. See Polish National Alliance v. N. L. R. B., 322 U.S. 643, 64 S.Ct. 1196, 88 L.Ed. 1509; N. L. R. B. v. Phoenix Mutual Life Insurance Co., 7 Cir., 167 F.2d 983, 6 A.L.R.2d 408. Nor does it deny that documents and communications essential to the negotiation and service of insurance contracts outside the state are commerce within the meaning of Section 2(6) of the Act. See United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440. But, invoking the doctrine of de minimum non curat lex to its own interstate activities, it is vigorously and earnestly contended that their impact on interstate commerce is so inconsequential that "the channels of commerce would remain open and there would hardly be a ripple on the sea of commerce" if they were discontinued, or were stopped or curtailed because of the labor dispute. Then, it is said with equal force and vigor that even though such activities do affect commerce, the purely local activities of the building service employees are not a part of such commerce; do not have any substantial effect thereon, and are not, therefore, within the scope of the Act.

In the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq., the Congress used the phrase "affecting commerce" to manifest its purpose to exercise the full sweep of its constitutional

authority to prevent the harmful effects of industrial strife on interstate commerce. See Section 10(a); Polish Alliance v. N. L. R. B., supra. And, that phrase, with its statutory definition and judicial construction was carried over into the Labor Management Relations Act of 1947. See Sections 10(a) and 2(7). The scope of the Act and the jurisdiction of the Board under it were not contracted. The Board is specifically empowered to prevent any proscribed unfair labor practice "affecting commerce," and whether any such unfair labor practice affects commerce is not to be determined solely by the quantitative effect of the activities immediately before us. See N. L. R. B. v. Fainblatt, 306 U.S. 601, 307 U.S. 609, 59 S.Ct. 668, 83 L.Ed. 1014; Polish Alliance v. N. L. R. B., supra; United Brotherhood of Carpenters v. Sperry, 10 Cir., 170 F.2d 863; J. L. Brandeis & Sons v. N. L. R. B., 8 Cir., 142 F.2d 977, certiorari denied, 323 U.S. 751, 65 S.Ct. 85, 89 L.Ed. 601.

 Whether, therefore, the respondent's interstate activities affect commerce is not to be judged by their quantitative relationship to the whole of its business activities. Nor, is it decisive that the labor dispute in this case is wholly between employees performing purely local activities. The Act extends to and was explicitly designed to regulate not merely interstate transactions, but all activities which in their totality adversely affect the full flow of interstate commerce. See N. L. R. B. v. Fainblatt, supra; United Brotherhood of Carpenters v. Sperry, supra. The touch-Carpenters v. Sperry, supra. The touchstone of jurisdiction is the ultimate effect on commerce, and our query is whether the acts or practices of the respondent would lead or tend to lead to a labor dispute with its service employees, which would obstruct or burden the respondent's interstate activities. The test of coverage is different from the employees of a building under the Fair Labor Standards Act, where the question is whether their activities are "in commerce", or in work so closely related to it, as to be practically a part of it. See 29 U.S.C.A. § 201 et seq.; Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638;

Rucker v. First National Bank of Miami, Oklahoma, 10 Cir., 138 F.2d 699. By the use of the phrase "in commerce" in the Fair Labor Standards Act the Congress did not purport to fully exhaust its constitutional powers over commerce. Rucker v. First National Bank of Miami, Oklahoma, supra.

 The employees involved here maintain and operate the building, including the elevators, where the respondent conducts its insurance business. Those directly engaged in the conduct of the business undoubtedly depend upon the maintenance employees for elevator service to and from the offices on the sixth and seventh floors. Then, too, the maintenance of these offices is an important part of the performance of the duties incident to the business. It is reasonably foreseeable that a stoppage of the elevators and the maintenance of the building, with picket lines in front, would have a substantially adverse effect upon the conduct of the business, including the interstate activities, See Butler Bros. v. N. L. R. B., 7 Cir., 134 F.2d 981. This situation is different from N. L. R. B. v. Shawnee Milling Company, 10 Cir., 184 F.2d 57, where the purely intrastate activities of an employer in one city were held not to substantially affect its interstate operations in another city. In that case we refused to sustain the finding that a labor disturbance in the plant devoted wholly to intrastate operations would unduly burden the interstate operations at the other plant. In the circumstances here we are unable to say that a labor dispute would not interfere with the full flow of commerce, and accordingly conclude that the Board properly asserted jurisdiction.

The respondent next contends that the Board's order must be set aside because not supported by substantial evidence, as that term establishes a standard of proof under Section 10(e) of the Labor Management Relations Act.

 Prior to Universal Camera Corp. v. N. L. R. B., 71 S.Ct. 456, we had not thought that the change in the phraseology of Section 10(e), wrought by the Taft-Hartley Act, established any different standard of proof for determining whether the

Board's order should be enforced. See N. L. R. B. v. Continental Oil Company, 10 Cir., 179 F.2d 552. In making pragmatic application of the substantial evidence rule, however, we have always recognized our ultimate responsibility for the rationality of the Board's decision, keeping in mind the central idea that the Board in the first instance—not this court—has the primary function of administering the Act, to effectuate the manifest congressional purpose. See Boeing Airplane Co. v. N. L. R. B., 10 Cir., 140 F.2d 423; Harp v. N. L. R. B., 10 Cir., 138 F.2d 546; N. L. R. B. v. Denver Tent & Awning Co., 10 Cir., 138 F.2d 410; Nevada Consolidated Copper Corp. v. N. L. R. B., 10 Cir., 122 F.2d 587, reversed 316 U.S. 105, 62 S.Ct. 960, 86 L.Ed. 1305. And, since the amendatory Act did not purport to curtail the power of the Board to prevent proscribed unfair labor practices, and since "no drastic reversal of attitude was intended" by the change in terminology in Section 10(e), we perceive that the net effect of the Universal Camera Corporation case is to quicken the disposition of the appellate courts to vouchsafe the integrity of judicial review. In other words, our application of the substantial evidence rule should not be "merely the judicial echo of the Board's conclusion."

The Board found that the respondent violated Section 8(a)(1) of the Act by its conduct in interrogating Orcutt and Rutledge, two of its employees in respect to their union activities and membership; and that it violated Section 8(a)(3) in discharging employee Sommars for union activities and membership.

The evidence shows in material part that Beam, the Union representative called upon the respondent to inquire if Sommars had been discharged for union membership or activity and was told by Swain, who had charge of the rentals and collections of the office building, "You God damn right I fired her because she joined the Union and if any of the rest of them join the Union I will fire them." A few days later when he called to see if they would consider reinstating Sommars he was told by Wilson, the Building Engineer, that they did not need her any longer; that they had employed three new employees and the Union no longer had a majority among the building employees. Swain remembered Beam's visit but said he did not know that he was from the Union and wondered at the time what his interest in the discharge was, and denied telling Beam that Sommars was fired for joining the Union. Wilson admitted the statement as to the hiring of new employees, but stated that he was being facetious. Both Wilson and Swain related acts of inefficiency and stated that such inefficiency was the only reason for Sommars' discharge.

Employee Orcutt was called to Swain's office a short time after Sommars was discharged, and asked if the Union organizer had been in the building and if she belonged to the Union. Employee Rutledge was asked by Wilson when he was employed whether he belonged to the Union. On the night before Sommars was discharged, the Union organizer was in the building talking with Sommars and other employees, including one by the name of Lowery. Thereafter, Lowery went to the seventh floor where the President of respondent, Mr. Inhofe, was in his office, and shortly thereafter Wilson and Swain came to the building. When Lowery returned to his work he told Rutledge he had been talking with Swain, Wilson and Inhofe about Sommars; that "they came near firing her the first time the Union man was down there and they will damn sure fire her this time." Wilson, Swain, Inhofe and Lowery denied all this testimony, other than the fact that Inhofe was in his office that evening.

This is a typical record of positive statements and denials of unfair labor practices. Swain's version of the conversation about the discharge of Sommars differs radically from that offered by the Union representative Beam; Rutledge and Orcutt's testimony is categorically denied. Although as a trier of the facts we might have chosen to accept the respondent's version of its activities, we agree with the Board that the record as a whole warrants the inferences of unfair labor practices drawn by the Examiner, and the order will be enforced.