## NATIONAL LABOR RELATIONS BOARD v. MACHINE PRODUCTS CO., Inc.

No. 4439.

United States Court of Appeals
Tenth Circuit.

July 5, 1952.

Owsley Vose, Atty. National Labor Relations Board, Washington, D. C. (George J. Bott, General Counsel, David P. Findling, A. Norman Somers, and James Ryan, Washington, D. C., on the brief), for petitioner.

Josephy H. McDowell, Kansas City, Kan., for respondent.

Before PHILLIPS, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

This case is here upon petition of the National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act, as amended, 61 Stat. 136, 29 U.S.C.A. § 151 et seq. for enforcement of its order issued against the respondent, Machine Products Company.

Following the usual and customary proceedings under Section 10 of the Act, the Board found that the respondent had, in the course of an economic layoff, selected two employees for discharge because of union activities; that it questioned employees concerning union matters, and made veiled threats and warnings, thereby discouraging membership in the Union and interfering with, restraining and coercing its employees in violation of Section 8(a) (3)

· Huxman, Circuit Judge, dissented in part.

and (1) of the Act. Based upon these findings, the Board issued the usual cease and desist order. It further ordered respondent to reinstate two employees, Ballew and Rosenbum, with back pay, and to post notices of compliance with such order. The sole question presented by the petition for enforcement and answer thereto, is the correctness of the Board's findings.

During World War II the United States constructed a large airplane plant at Tulsa, Oklahoma. In 1949, the plant was being protected and maintained on a stand-by status with a personnel of 117 civil service employees working under the control and supervision of the United States Air Force. In September 1949, for economic reasons, the Air Force reduced its civil service personnel and awarded protection and maintenance contracts on a cost-plus-a-fixed-fee basis. The respondent company was awarded the contract for the Tulsa plant, effective September 30, 1949, through June 30, 1951. On September 26, Mr. Dickson, President of the respondent, went to Tulsa to make arrangements for taking over the plant. One hundred of the civil service employees were hired for a probationary period of sixty days, or until the respondent could determine the amount of work to be done and the number of employees which would be needed therefor.

The Air Force had allocated a definite amount of money for the cost of operating the Tulsa plant during the contract period and expenses had to be kept within this amount. All of the cost of labor and material was paid by the respondent which in turn was reimbursed by the Air Force. The respondent then received a fixed fee each month, which was in nowise dependent on, or affected by, the number of employees or the salaries paid.

After respondent had operated the plant for twenty-eight days, and on November 7, 1949, the Air Force sent an accounting officer, an inspector and a contract officer, to examine the progress being made under the contract. It was determined at a conference between the Air Force representatives and respondent that the costs of operation were exceeding the monthly pro rata of money allotted, and the Air Force suggested a survey to reduce expenses. Mr. Dickson pointed out to the Commanding Officer that the plant could be operated with two less personnel in the boiler room and two less electricians, thereby effecting a payroll saving of approximately $1,000.00 per month. Accordingly, and on November 11, 1949, four men were laid off, including Rosenbum and Ballew. None of the four men were ever replaced and the operation continued with two less men in the boiler room and two less electricians. Later on a third electrician was laid off and reductions were made in other departments.

The Board concedes, under these facts, that the respondent's reduction in force was motivated by legitimate reasons, but it found that in selecting the men to be discharged under the economy program, Rosenbum and Ballew were chosen because of their membership in the Union and their activities in attempting to organize the employees at the Tulsa plant. The evidence upon which the Board based its finding of discriminatory selection may be summarized as follows.

About ten days before the reduction in force, employee Rosenbum approached Callicoat, the Union representative, regarding organization of the employees at the Tulsa plant under the "new set-up," and was given organization cards for the purpose of obtaining signatures. Shortly thereafter an organization meeting was called and eighteen of respondent's employees attended. On November 7, the Union representative called on Superintendent Buck and asked for union recognition. Buck told Callicoat that he would first have to talk to Captain Emanual, the Commanding Officer at the Plant. Emanual told Callicoat that while he had no objection to the employees organizing, it would be necessary for the Union to be properly investigated and if nothing disfavorable to the Government was revealed, the Air Force would not be "opposed to organized labor." Callicoat stated that Dickson, President of respondent, and Superintendent Buck, told him they didn't want the place organized, but at another place in his testimony he stated that they advised him they had no objection to unionization.

Hobby, the Plant Engineer, testified that Dickson informed him on November the 8th or 9th, there was to be a reduction in personnel in the various departments, and that two of the boiler men under his supervision would be laid off. That later, in discussing the "matter of the lay-off" with Superintendent Buck, he inquired how to determine which of the employees to lay off, and Buck stated that the two of them would make the selection. Hobby suggested that Ellington, the immediate supervisor over the group, be consulted but Buck stated that he wanted the selection made immediately and that Rosenbum would be one to go. Hobby then told Buck that if it was up to him, he would just as soon "dump the names in a hat and pick out a couple." Hobby further testified that shortly after the plant was taken over by respondent, he and Buck were having a "more or less general discussion" about things at the plant; that there was no issue about the union, but in the discussion he informed Buck that he and Rosenbum were members of the union. Shortly after the lay-off Hobby resigned stating as his reason, that he felt under the situation then existing at the plant he would not have the confidence of both his employer and fellow employees. His position was never refilled.

Ellington, the foreman in charge of the boiler room, testified that he believed Rosenbum and Hickman, the other employee dismissed from the boiler room force, were the logical ones to go under the personnel reduction program, and that the question of whether they did or did not belong to the union was of no consequence in the decision. He stated that Rosenbum had the reputation of being quite a talker; that he would go about the plant and talk to different employees from ten to fifteen minutes at a time, and that on one occasion he told Rosenbum "he had better go a little bit slow on his talking because he didn't know who he was talking to at that time." While the Union was not mentioned, Ellington stated that he was sure Rosenbum understood he was talking about the Union.

Sillman, foreman of the electricians, testified that after being notified by Buck that the force of electricians should be reduced by two, he determined which men should go and submitted their names. In selecting them he chose the two whose services he thought he could best dispense with; that although some of the electricians were union members he did not consider that element in making his decision. He stated that he and Buck, at one time discussed union activity in the plant and he told Buck that Ballew had approached him about joining the union.

Rosenbum did not appear as a witness. Ballew testified that when he was getting signatures on the organization cards he asked Foreman Sillman if he was interested in joining the union and he was not; that later Sillman asked what he, Ballew, thought the reaction of the respondent would be toward organization of the employees and he told him that he did not know but that they probably would not like it; that Sillman then stated he thought they know of Ballew's activity and that if he lost his job or there was any trouble he did not want Ballew to think that he, Sillman, was involved or that he had told Buck anything.

Buck, the General Superintendent, testified that he knew Rosenbum and Ballew, as well as other employees, were members of the Union, but that membership or non-membership in the union had nothing whatsoever to do with the selection of the men laid off under the economy program. He stated that he asked Hobby to select the two men to be laid off in the boiler room, but that Hobby did not want the responsibility—"he didn't like to see men laid off." After Hobby's reluctance to choose the men, Buck then selected Rosenbum because he "talked too much and was interfering with the other employees." Buck further testified that he knew some of the men were unhappy because they felt they were not getting as many advantages and benefits under respondent's operation of the plant as they did when working for the Air Force on a civil service status, but that he did not know of the unfair labor charges until this suit was filed.

Captain Emanual, the Commanding Officer in charge of the Tulsa plant during the respondent's contract period, stated that both Buck and Dickson had taken the posi-

tion that it was entirely up to the majority of the employees whether they organized and that if they did want to be represented by the union, respondent would try to make adjustments with the auditors and the contracting officer of the Air Force to get the employees what they might gain from the union.

Dickson, President of respondent, testified that it had never been the policy of the Company to oppose organized labor; that in the operation of other plants under similar contracts respondent had recognized and bargained with union representatives. He stated that he did not give instructions to Superintendent Buck, or anyone else, to discriminate between union and non-union men in the lay-off program—that it would have been "contradictory to my policy."

In making its finding of discriminatory discharges the Board expressly relied upon the testimony of Hobby, the boiler room engineer. But, we think Hobby's testimony, when judged in the light of other relevant and undisputed facts, is stripped of most of its probative value and falls far short of the substantial evidence rule which makes the Board's findings conclusive. It is admitted that the respondent's reduction in personnel was motivated by legitimate purposes. Under its contract with the Air Force, respondent did not stand to gain in any respect by an anti-union program and under the undisputed evidence employees other than Rosenbum and Ballew were union members. The respondent has been engaged throughout the country in operating plants under similar contracts and its record of labor relations in undeniably above reproach.

While we are not unmindful of the Board's prerogative in weighing the evidence and judging the credibility of the witnesses, we are poignantly aware of our ultimate responsibility for the rationality of the Board's decision. See N. L. R. B. v. Tri-State Casualty Ins. Co., 10 Cir., 188 F.2d 50.

When all the evidence is viewed in the context in which it was given we are convinced that it does not support the Board's order, and enforcement is denied.

HUXMAN, Circuit Judge (dissenting in part and concurring in part).

It is my view there is enough in the record to sustain the Board's finding with respect to Rosenbum and that as to him the Board's order should be in force. In all other respects I concur in the opinion of the majority.