No. 40,486

RICHARD NEWELL, d/b/a EL DORADO DAIRY, *Appellee*, v. CHAUFFEURS, TEAMSTERS & HELPERS LOCAL UNION 795; S. E. SMITH and the agents, servants, employees and attorneys of any of said defendants, *Appellants*.

(317 P. 2d 817)

Opinion filed November 9, 1957.

*Russell Cranmer*, of Wichita, argued the cause, and *Payne H. Ratner, Louise Mattox, Payne H. Ratner, Jr., Dale B. Stinson, Jr., Cliff W. Ratner, William L. Fry, A. Wayne Murphy, Bernard V. Borst, D. Clifford Allison,* and *Gerald D. Lasswell,* all of Wichita, were with him on the briefs for appellants.

*M. F. Litras,* of ElDorado, argued the cause, and *R. C. Woodward* and *H. Pauline Woodward,* both of ElDorado, were with him on the briefs for appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal from an order granting an employer a permanent injunction against a Labor Union for activities alleged to consist of unlawful picketing and boycotting the employer's dairy business in ElDorado, Kansas. The Union appeals to this court contending: (1) That the district court did not have jurisdiction of the subject matter of the action since it involved a labor dispute within the exclusive jurisdiction of the National Labor Relations Board, and (2) that even though the National Labor Relations Board would not take jurisdiction, the conduct of the Union was protected under the Federal law.

The appellee, Richard Newell, is the owner and operator of the ElDorado Dairy. He filed this action as plaintiff in the district court of Butler County, Kansas, against the Chauffeurs, Teamsters & Helpers Local Union 795; S. E. Smith and the agents, servants, employees and attorneys of any of said defendants, appellants herein.

The district court found generally for the appellee in granting the injunction, therefore, the facts disclosed by the evidence will be set forth most favorably to the appellee where the evidence conflicts. If it is assumed that there is state jurisdiction of the labor dispute in question, the judgment insofar as it is supported by the evidence, from which the trial court could find as it did and issue the permanent injunction, must stand.

The appellee employed Cleo A. Hodgens as a wholesale route driver, Orville A. Church as a retail route driver, and Bobby Dee Grant as a relief driver and also as helper on two dairy routes in ElDorado, Kansas. On July 14, 1955, these three employees authorized the appellant Union to represent them in negotiations with respect to wages, hours and conditions of employment with the appellee. Appellant, S. E. Smith, the president and business agent of the appellant Union, so notified Richard Newell on July 15, 1955, by registered letter. Smith further requested Newell to advise him whether or not Newell would recognize the Local Union 795 as the bargaining agent of the employees in the afore-stated job classifications, and further requested a meeting with Newell for the purpose of negotiating a working condition contract.

Newell received the letter from Smith on Saturday, July 16, 1955. Thereafter, Newell transferred the relief driver and helper to inside work. He took the wholesale driver for a ride but did not discuss the letter he had received from Smith. He then fired the retail driver, Church, on July 19, 1955. On the following day Smith received Newell's answering letter which informed Smith that he would be glad to discuss anything concerning the drivers and helpers. Smith then went to ElDorado and met with Newell. At the meeting Smith requested that the retail driver be put back to work and that Newell recognize the Union and commence negotiating a working condition contract. Newell refused to put Church back to work giving as his reason the inefficiency and carelessness with which Church had been performing his work. The discussion centered only around the employment of Church, Smith refusing to negotiate in any manner until Church was reinstated as an employee. Newell's attorney was on vacation at the time of the conference and Newell refused to make further commitments until such time as he had an opportunity to consult with his attorney. On this point Smith testified:

". . . I asked him again if he wouldn't consider the reinstatement of Church and negotiate a contract. He told me without seeing his attorney that

was his final answer. I told him 'I am satisfied if that is your final answer there will be a strike at your place Monday morning, July 25th'. I contacted the men and they requested I come and meet them at Orville Church's house."

S. E. Smith and Mel Chance then met with Hodgens, Grant and Church at the latter's house in ElDorado, Kansas, on Saturday, July 23.

Picketing of the ElDorado Dairy started on Monday, July 25. They picketed every day except Sunday from 8:00 a. m., to 5:30 p. m. The employees, Hodgens, Church and Grant, picketed one at a time and walked back and forth in front of the appellee's dairy in the street about two feet from the curb. Each walked for thirty minutes and was then off for one hour, but usually remained in the vicinity, either across the street or next to the dairy property on either side. The person picketing carried a banner on which the legend read as follows:

"This establishment on strike, Teamsters' Union Local 795—Wichita."

The persons picketing handed out literature. They gave it to retail customers as they left the ElDorado Dairy building and some of the literature was left at grocery stores in which appellee's dairy products were sold. The leaflet handed out read as follows:

"ELDORADO DAIRY ON STRIKE!

"All consumers of milk and other products sold by the Eldorado Dairy Co. are advised that a strike of driver and helper employees continues at that plant.

"Non-union drivers are delivering milk to retail customers and the owner himself is delivering to the stores and other wholesale stops.

"These striking employees are fighting for decent wages and conditions— believing that they too are entitled to more than $25.00 to $55.00 per week for their efforts.

"Won't you please help these men in their efforts to better themselves by Not purchasing milk and other products sold by the Eldorado Dairy Co.

"STRIKING EMPLOYEES OF
ELDORADO DAIRY CO."

S. E. Smith himself took pictures and instructed Mr. Nitcher, an agent of the appellant Union in charge of the picketing, to see that pictures were taken. Among the pictures taken by Smith was defendant's Exhibit D showing two of the men employed during the strike to drive the ElDorado Dairy Company trucks; defendant's Exhibit F, a photo of a customer entering the front door of the El-Dorado Dairy; defendant's Exhibit G shows the same customer leaving the dairy with a sack full of purchases together with the picket in front of the dairy; defendant's Exhibit I shows an employee of

the ElDorado Dairy who is either loading or unloading some cases from the truck at the side entrance to the dairy; and defendant's Exhibit K shows the front of the ElDorado Dairy with the picket, Bobby Grant, and a customer who was getting out of his pick-up truck in front of the dairy.

Church testified that S. E. Smith instructed him to take his camera to the ElDorado Dairy during the course of the picketing. Church stated that his hobby was photography and that he took pictures of persons entering and leaving the ElDorado Dairy, although part of the time there was no film in the camera. Each of the other pickets, Hodgens and Grant, either took pictures of patrons entering the ElDorado Dairy and leaving or pretended that they were taking pictures when there was no film in the camera. Numerous complaints were made by customers of the ElDorado Dairy to Mr. Newell or other employees of the dairy relative to having their pictures taken by the pickets. Profanity was heard in connection with the picketing and the evidence discloses that the police were called on one occasion concerning the conduct of the pickets by a lady living near the ElDorado Dairy.

The picketing seriously affected the amount of business carried on by the ElDorado Dairy. Some of the retail customers on the route quit taking appellee's dairy products. Others refused to purchase products sold at retail at the ElDorado Dairy building itself, and three wholesale outlets which sold at retail stopped taking ElDorado Dairy products. These were the Farm and City Market, Wynn-Warren Foodliner and the Kroger Market.

The manager of the Farm and City Market informed the appellee that he did not want the appellee's milk in his store because the appellee was having labor trouble. Mel Chance, a business agent of the appellant Union, informed Neil Cottler, the manager of the Associated Grocers Corporation in Wichita, Kansas, that there was a labor controversy between the appellant Union and the appellee. The Associated Grocers Corporation hires members of the appellant Union as warehousemen and truck drivers pursuant to a working condition contract between the Union and the Associated Grocers Corporation. The Associated Grocers Corporation supplies the Joe Brown Market, Carter's Market, Graham's Market and the Lockwood Market in ElDorado with groceries. All of these stores handle milk of the ElDorado Dairy. There was neither a labor dispute at any of these markets, nor did picketing take place at

them. There is a provision in the contract between the Union and the Associated Grocers Corporation that their employees cannot be compelled to cross a picket line where a labor dispute exists.

Eldon Dye, manager of the Fleming Company, Wichita, Kansas, requested Burl Wynn, a partner of the Wynn-Warren Foodliner, a grocery store in ElDorado, to take the appellee's milk out of the Wynn-Warren Foodliner. On Wednesday, August 31, 1955, pursuant to this request, Burl Wynn discontinued selling the appellee's dairy products at the Wynn-Warren Foodliner. On September 2, 1955, Mel Chance went into the Wynn-Warren Foodliner to ascertain whether ElDorado Dairy products were being handled there. Chance disputed the word of Burl Wynn after examining the milk counter. It was not until Wynn pointed out that the word "ElDorado" on the cap of milk bottles represented the place where the Meadow Gold milk, which he had in the counter, was bottled that Chance was satisfied ElDorado Dairy products had been removed from the store. The Fleming Company, distributor of IGA stock, was the Wynn-Warren Foodliner's chief source of grocery supplies. Mr. Dye had informed Wynn that the appellant Union had made the request that the milk be removed. Mr. Wynn testified as follows:

". . . Mr. Chance came to see if the milk had been removed. I had never met Mr. Chance, and I don't believe I have since. After some controversy, I was of the opinion we had a right to put milk in our box, but naturally, I felt, if they were going to put the finger just because I bought groceries, it was easier to stop my source of supply, I asked Mr. Chance what they expected to do.

"Q. What did Mr. Chance propose to you?

"A. I ask him how he proposed to shut off our supply of groceries, was he going to put pickets around our place or the Fleming place. He said, 'No,' all he would have to do would be to notify the Fleming drivers they should not deliver groceries and that would be all there was to it. I want it understood I have no hard feelings, I was subpoenaed to tell my story and I am here now because of that."

On September 2, 1955, the appellee procured an *ex parte* restraining order enjoining the appellant from, among other things, picketing the appellee's place of business. The trial court further ordered the appellants to appear before the court on September 8, 1955, and show cause why they should not be permanently enjoined.

On September 8, 1955, the appellants appeared and trial was had on the merits of the case. The court then continued the restraining order in effect and took the case under advisement. The court an-

nounced its decision on May 26, 1956, granting a permanent injunction from which the appellants have appealed.

The court sustained a demurrer as to the attorneys for the appellants who were made parties defendant in the lower court and thus removed them from the action. The journal entry of the trial court insofar as pertinent reads as follows:

". . . . the Court is of the opinion that the plaintiff, Richard Newell, d/b/a the El Dorado Dairy, was not engaged in interstate commerce, nor did the business conducted by him appreciably affect interstate commerce, and that the National Labor Relations Board does not have jurisdiction herein, but that the State Court does have jurisdiction; that the strike was illegally called; that the defendant did not comply with the applicable Kansas statutes; that the picketing was not peaceful due to the fact that there was enough disturbance by the pickets, making it necessary for the police to be called on at least one occasion; that the taking of pictures or pretended pictures was an intimidation to the public and the customers of the plaintiff, and the Court further finds generally for the plaintiff on all issues of fact and law herein, and that the injunction prayed for herein should be made permanent.

"IT IS THEREFORE BY THE COURT CONSIDERED, ORDERED, ADJUDGED AND DECREED That the defendant, Chauffeurs, Teamsters & Helpers Local Union 795, S. E. Smith, and the agents, servants and employees of said defendant and each and every and all other persons acting at the direction and in consort with the said defendant or any of them, be and they are permanently enjoined and restrained:

"A. From molesting, bothering, threatening, intimidating, or interfering with the plaintiff, his place of business, property, employees or any of them.

"B. From intimidating, harassing, threatening or interfering with patrons of the plaintiff either by threats or any other unlawful means, or seeking to induce or inducing any customer or customers, patron or patrons of plaintiff away from place of business or directing, inducing or intimidating away the patronage of business from him.

"C. From inducing, intimidating, or encouraging employees of employers, other that [than] plaintiff, by orders, boycott or blacklist or any other like or similar acts to engage in a concerted refusal in the course of their employment to transport the goods, wares and merchandise of said employers, in order to force such other employers to cease doing business with plaintiff or with customers and patrons of plaintiff.

"D. From stationing or placing at any place in front of or about plaintiff's place of business or in the immediate vicinity thereof any picket, picket line, picket group or picket patrol.

"E. From any attempt to force or intimidate plaintiff to bargain with defendants on behalf of nonemployees of said plaintiff."

The undisputed *evidence* presented by the record discloses that the appellee's annual gross sales were approximately $100,000.00. The total annual gross purchases of the appellee were approximately $72,000.00. The appellee purchased supplies from outside the State

of Kansas in the sum of $100.00 per month which were used in the appellee's dairy. The appellee's dairy equipment was manufactured outside the State of Kansas but was purchased locally. The appellee used two trucks, a Ford and a GMC, both of which were purchased locally but manufactured outside the State of Kansas. The appellee purchased all of his dairy products locally, processed them locally and sold them locally.

Recent cases have made it clear, where unfair labor practices are either protected or prohibited by the Labor Management Relations Act, 1947, that Congress has pre-empted the field in labor relations matters affecting (interstate) commerce and has vested exclusive jurisdiction in the National Labor Relations Board to determine such labor disputes. (*Guss v. Utah Labor Board*, 353 U. S. 1, 77 S. Ct. 598, 1 L. Ed. 2d 601; *Meat Cutters v. Fairlawn Meats*, 353 U. S. 20, 77 S. Ct. 604, 1 L. Ed. 2d 613; *Friesen v. General Team & Truck Drivers Local Union No. 54*, 181 Kan. 769, 317 P. 2d 366; *Asphalt Paving v. Local Union*, 181 Kan. 775, 317 P. 2d 349; and *Stieben v. Local Union No. 685*, 181 Kan. 832, 317 P. 2d 436.)

Does the appellee's business affect interstate commerce? The Labor Management Relations Act, 1947, (29 U. S. C. A. § 152) defines the terms "commerce" and "affecting commerce" as follows:

"(6) The term 'commerce' means trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia or any Territory of the United States and any State or other Territory, or between any foreign country and any State, Territory, or the District of Columbia, or within the District of Columbia or any Territory, or between points in the same State but through any other State or any Territory of the District of Columbia or any foreign country.

"(7) The term 'affecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce."

It is apparent from the foregoing sections of the Act that Congress has set no restrictions upon the jurisdiction of the Board to be determined or fixed exclusively by reference to the volume of interstate commerce involved.

In *Labor Board v. Fainblatt*, 306 U. S. 601, 59 S. Ct. 668, 83 L. Ed. 1014, the Supreme Court said:

"The Act on its face thus evidences the intention of Congress to exercise whatever power is constitutionally given to it to regulate commerce by the adoption of measures for the prevention or control of certain specified acts—

unfair labor practices—which provoke or tend to provoke strikes or labor disturbances affecting interstate commerce. Given the other needful conditions, commerce may be affected in the same manner and to the same extent in proportion to its volume, whether it be great or small. Examining the Act in the light of its purpose and of the circumstances in which it must be applied we can perceive no basis for inferring any intention of Congress to make the operation of the Act depend on any particular volume of commerce affected more than that to which courts would apply the maxim *de minimis*." (p. 607.)

The question whether or not a particular business affects interstate commerce must always be determined upon the facts and circumstances in each case. (*Edison Co. v. Labor Board*, 305 U. S. 197, 59 S. Ct. 206, 83 L. Ed. 126; *National Labor Relations Bd. v. Santa Cruz Fruit P. Co.*, 91 F. 2d 790 [affirmed 303 U. S. 453, 58 S. Ct. 656, 82 L. Ed. 954]; *Labor Board v. Denver Bldg. Council*, 341 U. S. 675, 71 S. Ct. 943, 95 L. Ed. 1284; and *National Labor Rel. Bd. v. Tri-State Casualty Ins. Co.*, 188 F. 2d 50.) The test of the Board's jurisdiction is not the volume of interstate commerce which may be affected, but the existence of such a relationship between the employer and his employees to the commerce that an unfair labor practice would lead or tend to lead to a labor dispute burdening or obstructing the free flow of commerce. (*Labor Board v. Fainblatt*, supra.) . If the flow of commerce is obstructed by a labor dispute it makes no difference in principle whether the interference is with the inward or outward movement of the goods. Commerce is affected in either case. (*Collins Baking Co. v. National Labor Relations Board*, 193 F. 2d 483.)

A study of recent decisions in the Federal courts (*National Labor Relations Bd. v. United Brotherhood*, 184 F. 2d 60 [certiorari denied 341 U. S. 947, 71 S. Ct. 1011, 95 L. Ed. 1371; rehearing denied 342 U. S. 843, 72 S. Ct. 20, 96 L. Ed. 637]; *National Labor Relations Board v. Townsend*, 185 F. 2d 378 [certiorari denied 341 U. S. 909, 71 S. Ct. 621, 95 L. Ed. 1346]; *National Labor Relations Board v. Bill Daniels, Inc.*, 202 F. 2d 579 [reversed per curiam 346 U. S. 918, 74 S. Ct. 305, 98 L. Ed. 413]; *National Labor Rel. Bd. v. Tri-State Casualty Ins. Co.*, supra; *Labor Board v. Denver Bldg. Council*, supra; *Carpenters Union v. Labor Board*, 341 U. S. 707, 71 S. Ct. 966, 95 L. Ed. 1309; and *Howell Chev. Co. v. Labor Board*, 346 U. S. 482, 74 S. Ct. 214, 98 L. Ed. 215) gives perspective to an application of the foregoing rules. In the instant case we are confronted with facts and circumstances which focus our attention upon the maxim *de minimis non curat lex*, meaning—the law does not notice (or

care for) trifling matters. (See, *Labor Board v. Denver Bldg. Council,* supra; and *National Labor Relations Board v. Townsend,* supra.)

Language by the Supreme Court in *Labor Board v. Jones & Laughlin,* 301 U. S. 1, 57 S. Ct. 615, 81 L. Ed. 893, decided under the Wagner Act which defined "affecting commerce" in the same identical language as the Labor Management Relations Act, 1947, is illuminating:

"This definition is one of exclusion as well as inclusion. The grant of authority to the Board does not purport to extend to the relationship between all industrial employees and employers. Its terms do not impose collective bargaining upon all industry regardless of effects upon interstate or foreign commerce. It purports to reach only what may be deemed to burden or obstruct that commerce and, thus qualified, it must be construed as contemplating the exercise of control within constitutional bounds. . . ." (p. 31.)

". . . Undoubtedly the scope of this power must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government. . . ." (p. 37.)

This court has recently held that whether an unfair labor practice, which is either protected or prohibited by the Labor Management Relations Act, 1947, and by the state statutes, affects (interstate) commerce is a question of fact upon which jurisdiction rests. Where state jurisdiction is challenged, an application for relief in a state court concerning an unfair labor practice empowers the state court to determine this question of fact from the evidence. (*Binder v. Local Union No. 685,* 181 Kan. 799, 317 P. 2d 371; and *Asphalt Paving v. Local Union,* supra.)

In the instant case the trial court found from the evidence that Richard Newell, d/b/a the ElDorado Dairy, "was not engaged in interstate commerce, nor did the business conducted by him appreciably affect interstate commerce." Upon all the facts and circumstances presented by the evidence in this case we see no justification for disturbing the trial court's finding. All dairy products were purchased locally, processed locally and sold locally. It could not be seriously argued that a labor dispute between the employer and employees would burden or obstruct the free flow of interstate commerce in this case merely because, in the purchase of capital assets from local sources long prior to the labor dispute, such assets were

originally manufactured in another state. Should this contention of the appellants be upheld every businessman who wears clothes manufactured outside the state, who drives an automobile manufactured outside the state, or who uses tools in his business that are manufactured outside of the state would be engaged in a business affecting interstate commerce within the meaning of the Labor Management Relations Act, 1947. If this were the law every person doing business in Kansas would be so engaged.

Under all of the facts and circumstances presented by the record in this case we cannot say that the trial court erred as a matter of law in finding that the purchase of items to the extent of $100.00 per month from sources beyond the borders of Kansas in the operation of the ElDorado Dairy were negligible under the maxim *de minimis.*

Appellants contend that even though the National Labor Relations Board would not take jurisdiction, the conduct of the Union was protected under the Federal law. Where a labor dispute does not affect interstate commerce within the meaning of the Federal Act, it is immaterial whether the unfair labor practices are protected or prohibited by the Labor Management Relations Act, 1947. Under such circumstances the labor dispute is within state domain.

The National Labor Relations Board in the exercise of its discretion has adopted arbitrary jurisdictional standards based upon the gross annual business of an employer. Those falling below the minimum jurisdictional standard set by the Board are informed upon application for relief that "the policies of the Act would not be effectuated by its assertion of jurisdiction in that case." (*Labor Board v. Denver Bldg. Council,* supra, p. 684; See, also: *Friesen v. General Team & Truck Drivers Local Union No. 54,* supra; *Guss v. Utah Labor Board,* supra; and *Meat Cutters v. Fairlawn,* supra.) This declination of jurisdiction may have been for budgetary or other reasons. The effect has been to create a vast no-man's land. The United States Senate Committee on Labor and Public Welfare recognized this fact in 1954 and proposed an amendment which would have empowered state courts and agencies to act upon the National Board's declination of jurisdiction. The Committee recognized the situation in these cases to be that where the Board will not assert jurisdiction over unfair labor practices affecting interstate commerce, the states are forbidden to do so, and

the injured parties are deprived of any forum in which to seek relief. (S. Rep. No. 1211, 83d Cong., 2d Sess. 18.) There is thus a hiatus—a no-man's land—in which the Federal Board declines to exercise its jurisdiction and the state agencies and courts have no jurisdiction. (*Guss v. Utah Labor Board,* supra.) Congress, however, failed to act upon the amendment. Precisely what inference may be drawn from such Congressional inaction is wholly speculative.

Appellants' position, if adopted as the law of this state, would have this court abdicate from all controversies involving unfair labor practices which are either prohibited or protected under the Labor Management Relations Act, 1947, since all business would affect interstate commerce. For this "Utopian" the appellant Union strives. Such law would leave small businesses at the complete mercy of powerful Labor Unions. They could organize and force negotiation in utter disregard of labor practices declared unlawful by both state and Federal laws. By unleashing powerful labor organizations against small businesses denied remedy, the obligation of contract which has ordered our economy for centuries could indiscriminately fall by impairment through the uncontrolled application of unfair labor practices. In this process many small businesses could be destroyed.

It would shock the conscience of this court to believe for one moment that Congress so intended the Labor Management Relations Act, 1947, to apply.

We have observed with particularity the fact that appellants have made no application to a state court for affirmative relief from labor practices on the part of the appellee. Assuming that appellants have a just grievance against Richard Newell, d/b/a the ElDorado Dairy, for interfering with the protected rights of his employees to organize and join a Labor Union of their own choice, and that the employees have the lawful right to strike and peaceably picket for a just grievance (questions we leave open for reasons hereafter stated), these facts in themselves would not authorize resort to unlawful labor practices by a Union in retaliation.

The appellee in the lower court has requested injunctive relief. If the foregoing assumptions were true, the question immediately arises whether one who seeks equity must do equity. This is answered by G. S. 1955 Supp., 44-814, which gives rise to a statutory cause of action. Any person violating the provisions of Chapter 44,

Article 8 of the Kansas statutes on Employer and Employee Relations may be enjoined by *any aggrieved party* from violating the provisions thereof by action in the district court of the proper county. Appellee is therefore authorized to maintain this action against the appellants. (See, *Binder v. Local Union No. 685,* supra.)

Appellants argue that G. S. 1949, 60-1107, places certain restrictions upon district courts in granting injunctions involving labor disputes. This statute provides that no restraining order or injunction shall be granted by any court of the state of Kansas in any case between employers and employees. It is not applicable where third persons are involved. (*Bull v. International Alliance,* 119 Kan. 713, 241 Pac. 459.) The appellants in the instant case do not fall within any of the classes stated in the statute, and are thus beyond the scope of its application. Whether G. S. 1955 Supp., 44-814, supersedes 60-1107, *supra,* or conflicts with it is not material in this case. We therefore leave the question open.

The unfair labor practices of which appellee complains consist of unlawful picketing and boycotting. G. S. 1955 Supp., 44-809, insofar as pertinent herein provides:

"It shall be unlawful for any person

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"(14) To engage in picketing by force and violence, or to picket in such a manner as to prevent ingress and egress to and from any premises, or to picket other than in a peaceable manner."

Assuming that the strike in the instant case was legal and that the appellants were entitled to exercise their right to picket peaceably, does the evidence support the conclusion of the trial court that the picketing was in contravention of the statute and *was not in a peaceable manner?* The evidence has been summarized heretofore in considerable detail and will not be repeated. As to the picketing profanity was used, the police were called by a neighbor lady on one occasion and all of the pickets used cameras for the purpose of photographing, or pretending to photograph, the customers and patrons of the appellee and appellee's employees. That the "photographing" was definitely calculated by appellants as a component part of the picketing is fully supported by the evidence. Pictures were taken by S. E. Smith, president of the appellant Union, which he identified in his testimony in chief. They disclose the application of professional "know-how." The photographs showing a customer ignoring a picket line, entering the store and also leaving the store with packages particularly identified with the picket, repre-

sent complete evidence. Likewise, a photo of the two employees beside an ElDorado Dairy truck replacing the striking drivers infers a Union purpose.

The sole purpose of taking pictures, or attempting to take them, was to intimidate the appellee, his employees, his customers and patrons so that they would refrain from patronizing the appellee or going about his place of business. In the long history of labor disputes resulting in violence and injury to persons, the public has naturally become very apprehensive of being identified with a labor dispute. A Union having positive proof of record that they crossed a picket line generates fear. Photographing persons who cross a picket line is the kind of intimidation that no person desires in any community at any time. When we have a community such as the City of ElDorado and its environs, which is already a highly industrialized and unionized community, the outright effect of a threatened use of photographs becomes even more important to the individual and to the appellee.

By fear of exposure in the use of photographs appellants have committed a grievous wrong to the appellee and his customers and employees. It represents an invasion of one's right to privacy. The possibility that a person's photograph might later be used to identify him as a person unfriendly to organized labor, and therefore subject him to possible physical violence, was a threat as real and present as if the picket had threatened him with violence if he dared to cross the picket line. It is stated in 31 Am. Jur. Labor, § 240, pp. 952 and 953, as follows:

". . . The law does not countenance any display that is the equivalent of force and intimidation, or of a disturbance of the peace, however laudable the motive or purpose of the strikers . . . Force threatened is the equivalent of force exercised . . . But even when the acts of the strikers, although unaccompanied by violence or threats, are such an annoyance to others as to amount to coercion or intimidation, they are unlawful."

Peaceful picketing has been justified under the constitutional guarantee of the right of free speech. It is a means of communication and as such it conveys the information of a labor grievance to the public. When the picketing goes beyond this purpose it then becomes unlawful and is no longer entitled to protection as a constitutional guarantee of free speech. This point has been dealt with at some length in *Binder v. Local Union No. 685*, supra, where numerous cases of the United States Supreme Court are considered. Reference is made thereto without further elaboration.

Resort to intimidation and threatened use of force against the appellee's customers and patrons and against the appellee and his employees by the appellants went far beyond any right of the Union employees to strike and picket peaceably for the purpose of communicating their grievance to the public. These were unlawful acts of coercion. Though the original picketing may have been peaceful and for the lawful purpose of putting pressure on the employer by communicating the grievance of the employees to the public, where these purposes were intermixed with acts of coercion which were unlawful, the picketing in its entirety became tainted with the unlawful purpose. The purpose of this coercive picketing was to strangulate the appellee's business and it was no doubt the hope of the appellant Union that this would hasten appellee's recognition of the Union's demands. Coercive picketing is unlawful and contrary to the public policy expressed by the legislature of Kansas.

The appellants were successful in bringing about a secondary boycott of appellee's business. Three of the largest wholesale outlets for ElDorado Dairy products were lost and the evidence discloses that conditions were ripe for terminating the remaining four wholesale outlets. Mel Chance was in ElDorado, Kansas, on the 2nd day of September, 1955, when he called at the Wynn-Warren Foodliner. This was the very day the temporary injunction was issued *ex parte*. What his activities for the remainder of the day would have been are, of course, speculative. But the evidence is clear that contact had been made with the remaining four grocers in ElDorado through their wholesale grocery distributor in Wichita at appellants' instigation. In our opinion the facts and circumstances indicated by the evidence presented in the record disclose a violation of G. S. 1955 Supp., 44-809a(1), on the part of the appellants.

A broad assumption has been made that the employees, Hodgens, Church and Grant, had the legal right to strike and that the appellants were entitled to picket peaceably. The factual statement of the case has been oversimplified in this respect. These questions are not free from doubt in the instant case. The assumptions upon which this opinion has been written have not been to the prejudice of appellants' rights herein, but the questions suggested by them we leave open for the reasons hereafter assigned.

G. S. 1955 Supp., 44-809, provides in part:

"It shall be unlawful for any person

"(1) To interfere with or prevent the right of franchise of any member of a labor organization. The right of franchise shall include the right of an employee to make complaint, file charges, give information or testimony concerning the violations of this act, or the petitioning to his union regarding any grievance he may have concerning his membership or employment, or the making known facts concerning such grievance or violations of law to any person, including public officials or the employer, and his right of free petition, lawful assemblage and free speech."

### G. S. 1955 Supp., 44-816, provides:

"Within sixty (60) days after the taking effect of this act, the state labor commissioner shall adopt rules and regulations governing the conduct and canvassing of elections for the selection of collective bargaining units, and by collective bargaining units relative to approval of all-union agreements, *strikes*, walk outs, or cessation of work or continuation thereof. Such rules and regulations may be amended, revised, or supplemented from time to time as the state labor commissioner shall deem advisable or necessary. All such rules and regulations shall be filed in the office of the revisor of statutes as provided in article 4 of chapter 77 of the General Statutes of 1949, or acts amendatory thereof." (Emphasis added.)

The foregoing sections in the Kansas statutes were adopted by the legislature in 1955 and became effective on the 1st day of July, 1955. The appellee argues that appellant Smith first met the three recruited employees of the appellee on July 14, 1955, and secured an authorization card signed by each of said three employees, recognizing the right of the appellant Union and appellant Smith to bargain for them. That on July 23, 1955, after one personal contact by the appellant Smith with the appellee, the Union members and appellant Smith decided to strike and two days later on Monday, July 25, the strike followed. Appellee argues that the strike, therefore, was based upon the agreement of the employees and the appellant Smith and nothing else.

The appellee's position is that the statute was in effect; it contained a positive mandate and appellee would have been in violation of the statute if he had attempted to recognize the Union as the bargaining agent of his employees prior to the time that it had been legally certified, as provided in said Act, and any strike called in contravention to the terms of said Act was illegal. Appellee argues the strike being illegal, all acts of the strikers to enforce their demands, including picketing, are also illegal and may properly be enjoined in an appropriate action for that purpose.

The appellant, S. E. Smith, testified that he knew the foregoing sections of the Kansas statutes became effective on the 1st day of

July, 1955, and that the State Labor Commissioner had not adopted the rules and regulations provided in 44-816, *supra,* at the time he called the strike. This, apparently, was the basis upon which the trial court made some of its findings and upon which a portion of its judgment was founded.

In our opinion the evidence in the record is deficient in certain respects to properly determine these issues. Furthermore, it is apparent that consideration should be given to constitutional aspects of the last two quoted sections of the statutes. Briefing on this point has been inadequate. We therefore leave open the questions whether the three employees, Hodgens, Church and Grant, had the legal right to strike and whether appellants had the lawful right to picket the ElDorado Dairy in a peaceable manner.

Accordingly, the conclusions of the trial court set forth in the journal entry which read:

". . . that the strike was illegally called; that the defendant did not comply with the applicable Kansas statutes; . . ."

are vacated, set aside and held for naught.

The judgment of the trial court is modified to read that the appellants, specifically designated in the journal entry: "be and they are permanently enjoined and restrained:

"A. From intimidating or threatening the plaintiff and his nonunion employees by the use of photography or by any other unlawful means.

"B. From intimidating, harassing or threatening patrons of the plaintiff's business by the use of photography or by any other unlawful means.

"C. From any and all acts or conduct designed to boycott plaintiff's business.

"D. From picketing plaintiff's place of business."

Counsel for appellants argue that an injunction should not go beyond the requirements or be broader or more extensive than the case warrants. The foregoing modification of the lower court's judgment is designed to confine the injunction to the needs in this case. It may be contended that an injunction against picketing in this case will restrain the exercise of a constitutional right. Acts of appellants which in isolation are peaceful picketing may be a part of coercive picketing when entangled with unlawful intimidation and threats. The picketing in this case was set in a background of intimidation and unlawful coercive pressures. Under such circumstances it may justifiably be concluded that the momentum of fear generated by past conduct and coercive pressures would survive even though

future picketing might be wholly peaceful. This is particularly true of a community the size of ElDorado, Kansas, and its environs. We conclude that the permanent injunction against picketing in this case does not transcend constitutional guarantees. (*Drivers Union v. Meadowmoor Co.*, 312 U. S. 287, 61 S. Ct. 552, 85 L. Ed. 836.)

The judgment of the trial court as herein modified is affirmed.